UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 15, 2006
Decided November 29, 2006

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 06-1274

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| *v.* | No. 02-CR-1129-10 |
| MELVAIN POOLE, *Defendant-Appellant*. | Joan B. Gottschall, *Judge*. |

## O R D E R

Melvain Poole pleaded guilty to two counts contained in a three count indictment filed against him: possessing a firearm as a felon, 18 U.S.C. § 922(g)(1) (Count 3); and possessing cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) (Count 10). After entering his pleas, the government dismissed a conspiracy count (Count 1). The drug count yielded a greater offense level than the gun count, so the guidelines range for both convictions was premised on U.S.S.G. § 2D1.1. Because the parties disputed the amount of cocaine for which Poole should be held accountable, the court held an evidentiary hearing.

At the hearing, FBI Special Agent Paul Bock testified that agents arrested Poole after investigating and arresting his cocaine supplier, Juan Corral. Corral cooperated with the government and identified Poole as one of his customers.

Between March 2002 and Corral's arrest that June, agents electronically established that some 52 calls took place between Corral's and Poole's phones. A wiretap of Corral's phone recorded 11 conversations between him and Poole beginning in May 2002. Corral initially told agents that Poole had bought six to nine kilograms of cocaine, but he later said the total was between four and seven kilograms. Bock explained the inconsistency by stating that the lower number excluded purchases from before the beginning of the charged conspiracy. Bock testified that Corral always delivered cocaine to Poole's home. The government also proffered evidence that agents seized five guns and four digital scales, two of them coated with cocaine residue, from Poole's home .

Corral testified at the hearing that he sold cocaine to Poole off and on beginning in 2000, with breaks while he was incarcerated or unable to procure drugs. The relationship, he said, was continuous between January 2001, when he got out of prison, and late June 2002, when he was arrested. During that period Poole always bought 1/8 of a kilogram (roughly 4.41 ounces), also referred to as a "4 or 5" or a "split." Corral estimated Poole purchased a total of four to seven kilograms. When pressed, Corral said there was "no question" he had delivered 4.5 ounces to Poole at least 20 times and more likely at least 30 times.

Corral also explained the content of several phone calls. In the first conversation, recorded May 13, 2002, Corral said he was "dead right now," meaning he was out of cocaine. Poole answered that he wished Corral had warned that he was "getting low," which Corral interpreted to mean running out of cocaine. Corral also testified about two calls on May 17, in which Corral asked Poole if he wanted cocaine and how much, and Poole replied that Corral should "just bring the 4 or 5." On June 7, Poole requested a "split," which Corral delivered. Corral also explained a call in which Poole asked how much he owed Corral for cocaine that, according to Corral, was fronted in 2000. Corral testified that he dealt with Poole before the first recorded call, and that they did not discuss drug type, price, or delivery in the recorded calls.

Juan Hernandez, another government informant, testified that he sold cocaine to Poole while Corral was imprisoned in 1999 and 2002 and whenever Poole could not get any from Corral. Hernandez said Poole bought an ounce from him twice a week during those times and bought 4.5 ounces twice. On cross-examination, he admitted that he did not tell investigators that he dealt with Poole as far back as 1999.

Finally, Poole testified at the hearing. He insisted that the first recorded call, on May 13, led to his very first drug purchase from Corral, and that the earlier calls between phones listed to him and Corral were calls involving his brothers, who were often at his house. Poole agreed that none of the recorded conversations

mentioned drug type, price, or delivery details but explained that his brothers had bought from Corral before, and so he knew the information from them. Poole said he made only three purchases of 4.5 ounces each from Corral—13.5 ounces total. Poole denied knowing Hernandez until 2002.

Based on this evidence, the government argued for a drug quantity reflecting the most conservative of Corral's estimates—20 deliveries of 1/8 of a kilogram, for a total of 2.5 kilograms. Poole countered that Corral's inconsistent estimates suggested that he was unreliable and trying to curry favor by overstating drug purchases by Poole and others. Poole also argued that Hernandez was unreliable because he was an informant and in his initial statements to agents he failed to mention selling to Poole before 2002. The district court concluded that Hernandez's testimony was "troubled" and chose to disregard it entirely. But the court did rely on Corral. The court credited Corral's testimony that he and Poole knew each other before the first recorded call, which, the court reasoned, better explained the limited content of the recorded conversations and the use of "lingo and slang." The court rejected as "absurd" the idea that Poole would make a first-time purchase without mentioning drug type, price, or drop-off procedures. The court concluded that Corral was sincere and trying to do his "very, very best to tell [the court] the truth," while it found Poole's testimony unbelievable. Though the court commented that "there is no good evidence as to drug quantity" and, in general, "no particularly believable witness" in drug cases, the court found that the government had nonetheless "carried its burden" of showing by a preponderance of the evidence that Corral had made 20 deliveries to Poole, and that Poole accordingly was responsible for 2.5 kilograms of cocaine.

That quantity yielded a base offense level of 28. *See* U.S.S.G. § 2D1.1(a)(3), (c)(6). After finding that there was not enough evidence to support a two-level increase for possession of a dangerous weapon, *see id*. § 2D1.1(b)(1), and that Poole's objections to the drug quantity did not indicate a lack of acceptance of responsibility, *see id*. § 3E1.1, the court calculated a total offense level of 25 (the § 922(g) violation did not result in a multiple-count adjustment, *see id*. §§ 3D1.1-.5). Poole had no prior convictions, so he faced a guidelines range of 57 to 71 months. The court sentenced him to 57 months on each count, to run concurrently.

On appeal, Poole argues that the district court improperly based its drug quantity finding on Corral's testimony. That testimony, says Poole, lacked sufficient indicia of reliability because the district court declined to credit Hernandez's corresponding testimony and because Corral gave inconsistent estimates of the drug quantity and as a government informant had an incentive to exaggerate.

The quantity of drugs attributable to a defendant is a factual finding. *United States v. Marty*, 450 F.3d 687, 689-90 (7th Cir. 2006). In making this finding, a district court may consider any evidence that bears sufficient indicia of reliability. *United States v. Sliman*, 449 F.3d 797, 802 (7th Cir. 2006) (citing U.S.S.G. § 6A1.3(a)). Evidence is not unreliable simply because it comes from a drug dealer or a government informant, so long as the district court credits the testimony. *United States v. White*, 360 F.3d 718, 720 (7th Cir. 2004).

Here, the district court disregarded as unreliable the testimony from Hernandez but credited the testimony from Corral. Corral's testimony, said the court, was "about as credible as I can ever get in such a case up to the 20 trip testimony he gave us." Corral's testimony was corroborated by the evidence of numerous phone calls between him and Poole, and the court reasoned that Corral was "far more credible than Mr. Poole in explaining" the recorded conversations. The court labeled as "absurd" Poole's testimony that the very first recorded conversation led to Poole's first-ever drug purchase from Corral. After observing the witnesses' demeanor, reconciling their testimony with the recorded conversations and other evidence, and listening to defense arguments concerning the factors relating to Corral's credibility, the district court was certainly entitled to accept Corral's testimony as true.

Poole finally argues that the district court violated the Sixth Amendment, and the holding in *United States v. Booker*, 543 U.S. 220, 244 (2005), by using a preponderance standard in calculating the drug quantity, rather than having a jury find the drug quantity using a reasonable-doubt standard. At oral argument, however, Poole's counsel acknowledged that we have repeatedly denied such challenges, *see United States v. Spence*, 450 F.3d 691, 696-97 (7th Cir. 2006); *Sliman*, 449 F.3d at 800-01; *United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006), and indicated that he simply wishes to preserve the argument. We decline to revisit the issue.

AFFIRMED.